### SEGURA v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 29, 1919.)

#### No. 3288.

HOMICIDE ⊕=250—SUFFICIENCY OF EVIDENCE.
    Evidence on a trial for murder, including the testimony of defendant, *held* to sustain a conviction.

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska.

Criminal prosecution by the United States against Mailo Segura. Judgment of conviction, and defendant brings error. Affirmed.

Leroy Tozier, of Fairbanks, Alaska, and Fernand De Journel and De Journel & De Journel, all of San Francisco, Cal., for plaintiff in error.

R. F. Roth, U. S. Atty., Harry E. Pratt, Asst. U. S. Atty., both of Fairbanks, Alaska, and Annette Abbott Adams, U. S. Atty., and Frank M. Silva, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The plaintiff in error was charged by indictment with the deliberate and premeditated murder of one J. E. Riley, known as George Riley, near the town of Flat, on Otter creek, in the territory of Alaska, May 5, 1918, of which crime he was convicted by the verdict of a jury, without the qualification authorized by the Code of Alaska, to which a sentence to imprisonment at hard labor for life would have attached. Thereafter the judgment of death was imposed

upon him by the judgment here brought for review. Sections 1883, 1884, Comp. Laws of Alaska, pp. 648, 649. In the court below a motion was made for a change of the place of trial from the town of Flat, where the court was held, to Fairbanks, or some other place within the Fourth judicial division of the territory, to be designated by the court, upon the alleged grounds that there was "reason to believe that an impartial trial could not be had at Flat," and that "the ends of justice would be promoted by the change." The additional transcript that has been brought here pursuant to the writ of certiorari heretofore issued out of this court shows that two affidavits were filed in support of the motion, one by the plaintiff in error and the other by his attorney, and five on the part of the government, all of which—in view of the fact that the plaintiff in error is under sentence of death—we have carefully examined and considered, regardless of any technical objections, and are unable to hold that the trial court committed any error or abuse of discretion in denying the motion, in addition to which it may be said that it appears from the supplemental transcript that the trial at Flat actually demonstrated that, while a number of persons summoned there as jurors disqualified themselves as such by reason of prejudice against the defendant to the indictment, there was no difficulty in securing a sufficient number of qualified jurors to whose service as such no valid objection was interposed, and no exception taken to any action of the trial court respecting them.

The only other point urged on behalf of the plaintiff in error is that the evidence was insufficient to justify the verdict that was returned, which point the record clearly shows to be without merit. There was evidence going to show that the deceased was engaged in dredging for gold, and owed, among others, the plaintiff in error, the indebtedness being for wood furnished by the latter, and which indebtedness had existed, according to the testimony of the plaintiff in error, for about two years, during which time he had made many efforts to collect it without success; the deceased refusing to execute to him any paper acknowledging such indebtedness, although verbally promising to pay it.

The plaintiff in error went again to Riley's place of business May 5, 1918, and in his testimony gives this account of what occurred there, and of his movements immediately preceding his going:

"Q. You were speaking a few minutes ago about the morning of the 5th day of May, 1918. You may go ahead and state what you were going to say when I interrupted you. On the morning of the 5th of May, what time did you get out of bed? A. I got up about half past 7, maybe 8 o'clock; about half past 7, something like that; and I went to the restaurant on Discovery.

"Q. Did you have your breakfast at the restaurant on Discovery? A. I had a cup of coffee and something like that; sat there a few minutes and go out again.

"Q. Then where did you go? A. Went to Riley's office.

"Q. Who did you see at Riley's office, if anybody? A. I came to Riley's office and Riley's bookkeeper was there, and I say, 'Good morning.' 'Yes, sir; mister.'

"Q. You said that? A. No; Riley's bookkeeper said that—'Yes, sir; mister.' I say, 'Did Riley tell you about that thing what he owes me to make any receipt for me?' He says, 'He never told me anything about that.' I says, 'Did he tell you anything about that at all?' He says, 'No; You come around

again.' The only thing he could tell me was, 'Come around again.' He says, 'You go and see him.' I says, 'Where he are?' He says, 'Around the machine shop some place, or around the dredge some place.'

"Q. I don't know that all the jurors can hear you. You say that you asked Riley's bookkeeper where Riley was? A. Yes.

"Q. And the bookkeeper told you that he guessed he was around the machine shop, or around the dredge, some place. A. He says, 'He is around the machine shop, and around the dredge, some place, but I don't know exactly the place.' And I went out again and came to the machine shop, and looked around the machine shop inside, and I couldn't see him around there. Then I went to the dredge, and looked around the dredge, and I can't see him; and I went to the boiler house, and when I came to the boiler house Riley was alongside of the boiler house, about a couple or three feet from the boiler house, right near the front. I holloed, 'Good morning.' 'Yes, sir.'

"Q. What is that? A. 'Yes, sir; what is it?' I say, 'I just come to ask you for that receipt again, to make me that receipt for what you owes me, so I can see, so I can understand how much you owes me. I can't understand how much you owes me without getting that receipt from you. I owe lots of money to people around, and if I can sell that receipt to the bank, or to the store, I got to pay my own debts, because people don't want to wait. I owe some money to people.'

"Q. What did he say then? A. He says: 'I told you that, lots of times, I don't want to make any receipt for you. I don't want to pay you any now, either. I have got lots of things in my head besides that.'

"Q. Speak louder. A. 'I couldn't make any receipt for you. I couldn't do anything for you right now, anyway. It don't make any difference what you owes to anybody; don't make any difference to me. I owes lots of money myself. That receipt won't do any good to you. I liable to go broke any day. People knows what kind of shape I am in. I don't think anybody would take any of my receipts. It won't make any difference to you.' I say: 'Mr. George, will you make me a receipt for the thing what you owes me, if you please?' Just like that (shakes his head). He stay there a couple or three minutes, something like that; in a couple or three minutes, turned around and spoke to the men that were working in the boiler house, and to Mr. Thibault, who was standing here, he spoke to him something about driving wood, and how much wood was burned up in a day, something like that, and George Riley stood up like that (indicating), and look around at something. I don't know what he looked around at; and I come back to him again, and I say: 'Will you, please, let's go to the office and make me that receipt for what you owes me, if you please.' He just looked like that at me (indicating). He turned his head like that. I come back to him again and say: 'Let's go in the office, if you please, and make me that receipt for what you owes me.' 'No; no; I don't want to write any; I have got lots of things to do like that.' And I stand off a couple or three minutes, hardly more than that, and Jim comes around, Riley's foreman comes around, and said something. And I stood by a pile of pipes a few minutes, and then Riley walked around there, around the boiler house, and took some kind of hose, and turned that hose on, and cleaned the ashes from the pipes with the hose. I stand on the track a few minutes, and I told him again—I say: 'Will you please go to the office and make me that receipt for what you owes me, because that receipt is good for me'—like that. He don't make me a receipt or pay me the cash what he owes me. He just look at me like that (indicating), and he says: 'You know what you got to do?' And he just look at me and he says: 'I give you some shells. That is all you can get from me.'

"Mr. Roth: What is that? You say Riley said, 'I give you some shells'? Before that there was something I couldn't hear and didn't understand.

"The Court: Speak louder.

"A. I says: 'I like to get that receipt from you. I like you to make me a receipt to pay me off. I don't know what I going to do with you'—just like that. He says: 'You know what you can do with me? You know what you can do with me?' 'With me' or 'with that.' I couldn't tell you—'with me' or 'with that.' He says, 'I give you some shells.' And he was working with his

right hand. I says, 'There will be no time for you,' and I took out the revolver from this place (showing) and I shot him once. He fell down and never holloed. I couldn't tell you I shot him in the shoulder, or what place I shot him. I shot him right in front, but he swung himself as soon as he saw me working with my right hand (showing); he swung himself from the left to the right, and fell. At the time I don't know what place the bullet catch him. He fall, and I was afraid of him, that he would bluff me, and then I shot him two times, one after the other.'

"Mr. Tozier: Q. How many times did you shoot him? A. I shot him three times."

There was testimony given by a witness for the government that, soon after the killing the defendant, when asked whether the deceased was facing him when shot, answered that he was; but the evidence on the part of the government, including the testimony of the doctor who examined the deceased very shortly after he was killed, was to the effect that all three of the shots were fired into the back of the deceased, and that the front part of his body had no bullet wound upon it, and that all three of the bullets lodged in the body, either one of which would have proved fatal within a very short time. And the witness Thibault testified to seeing the last shot fired into the prostrate body of the deceased.

Respecting the alleged premeditation with which the killing was done, the witness Keen testified that, during a conversation he had with the defendant, about March 1, 1918, regarding the money due him from Riley, defendant said: "I will kill the s——of a b——" —the witness adding:

"The last words he said, when he left my place, was that, if Riley didn't settle with him, he intended to kill him."

The witness Cadwallader also testified that the defendant had expressed to him a like intention; and the witness Knutsen testified that, after the deed was done, the defendant, referring to the body of the deceased, said:

"There is my $2,000. It is worth $2,000 to me."

Other testimony of like character and effect was given by the witness Matsen.

We are of the opinion that the judgment must be affirmed. Ordered accordingly.